The opinion of the court was delivered by
Spencer, J.
B. J. Elliott was twice married. By this first wife, Edith. Austin, he had one child, William. Edith died in 1864, leaving as sole heir said child then and yet a minor. At the death of his said wife, Elliott owned in community with her the plantation (near Baton Bouge) about which this controversy in part relates. In 1868 Elliott qualified as natural tutor of his said child, and Jeff. Thomas was appointed under tutor.
During the marriage between Elliott and his deceased wife, he received of her paraphernal funds, from the estates of her father and brother, $3961 75.
In June, 1868, Thomas, the under tutor, proceeded against Elliott, *32 tutor, for an account of tutorship, alleging that Elliott was embarrassed and the minor’s rights endangered. The account was rendered, and exhibited the above amount, $3961 73, as due the minor in money, and estimated the community property (the plantation) at $5000; of which one half belonged to the minor. No debts were stated against the minor or community. This account was homologated and made the judgment of the court. This judgment of homologation was recorded as a judicial mortgage. The claims of the minor were also duly recorded as legal mortgage prior to January 1,1870.
Thus matters stood until Feb., 1872, when Elliott applied to have the minor’s interest in the community property, i. e., the plantation, adjudicated to him under Art. C. C.
The plantation was valued by experts, and on the advice of a family meeting the minor’s share of said property was adjudicated to Elliott at $1000, with reservation of special mortgage, etc.
On Feb. 28,1872, Elliott applied for leave to give a special mortgage to the minor, under Art. C. C. He accompanied this application by an account of tutorship, filed Feb. 28, 1872, crediting the minor, as before, with paraphernal funds of the mother, $3961 73, and 5 per cent interest thereon; also with $1000, the price of the adjudicated community property. But he now claimed credit for large sums paid by him on community debts, which by said account were fixéd at $6662 49, one half to debit of minor being $3331 24. This sum together with the sum of $1083 40 for law charges, expenses of minor, etc., amounted to $4414 66, thus leaving balance in favor of minor of only $1286 52.
The under tutor, promptly, on the day this account was filed, answered “that he had no objection to its homologation; that having carefully examined it and the accompanying vouchers, and believing the same correct,” he joined in the prayer for its homologation.
It was on next day homologated, and the sum of $1286 52 fixed as the amount due the minor. No proof beyond the vouchers was administered as to these alleged community debts. A family meeting was convened and experts appointed to pass upon the sufficiency of the property offered to be specially mortgaged by the tutor. The report and deliberations represented it as ample. Thereupon the court authorized the special mortgage to be given by the tutor, and ordered and decreed the erasure and cancellation of all other mortgages of the minor.
The property thus specially mortgaged was a lot of 125 acres, constituting part of a tract of 327 acres bought by Elliott of J. A. Payne on Feb. 28,1872. Elliott paid for the whole 327 acres only one thousand dollars. This purchase was made on the very day he applied for and obtained authority to specially mortgage 125 acres of it, to secure $1286. This 125 acres he got valued at $2000. The evidence in this rec *33 ord satisfies us that $500 would have been an over valuation of it at the -time, and there existed on it two prior j udieial mortgages in favor of J. A. Payne for more than its value, as we shall see.
Having executed the special mortgage to the minor on March 8, 1872, Elliott on the same day mortgaged to Henry Newell, for a loan of #8000, the plantation, the minor’s one half of which he had caused to be adjudicated to himself a few days before for $1000.
After these transactions, Elliott died, and Lewis Austin became tutor of the minor William, and Mrs. M. E. Elliott (the second wife) became administratrix of the estate of her husband, who left a minor child, issue of this second marriage.
Lewis Austin, tutor, brought suit to annul these transactions and to reinstate the minor’s rights above described. Mrs. Elliott filed an account of her administration, proposing a distribution of the funds and estate in her hands.
That suit of Austin, tutor, and the oppositions to the account of administratrix were consolidated and tried together. The appeals from the judgment therein are the matters before us. The issues are numerous and some of them important. The principal questions presented* are :
First — Are the proceedings herein before detailed, whereby the minor William’s interest in the community was adjudicated to his father and whereby his legal and other mortgages were canceled by substitution of a special mortgage, valid and binding on him ?
Second — If not binding as between himself and the estate of his father, how far are third persons protected by the decrees in said proceedings, when they have dealt with the tutor on the faith thereof and bona fide ? Was Henry Newell the holder of the $8000-mortgage, in good faith ?
Third — Did Payne, who was a creditor by judgment duly recorded in 1868 of Elliott acquire a judicial mortgage on the property (327 acres) sold by him to Elliott, for cash, in 1872 ?
Fourth — Where the husband dies, leaving a minor child of his first marriage, possessing more than $1000, but also leaves a minor child and widow of his second marriage in indigent circumstances, can the latter claim the homestead of $1000 ?
Fifth — What is a sufficient registry of a private act of mortgage or privilege ?
Lastly — Does the physician’s bill for last illness require to be registered, to preserve its privilege ?
1st. As regards the adjudication of the community property to the father, the only objection that seems to have any force is that the price was inadequate. The property in 1868 was inventoried at $5000, and *34 one lialf of it at $1000 in 1872. True, this was a heavy depreciation, but not greater than was experienced in many other localities in this State-during these sad and long-to-be-remembered years.
We can not from this fact alone draw the conclusion that there was a fraud-intent conspiracy between the tutor, under tutor, experts, and family meeting.
But the proceedings for substituting a special for the legal mortgages held by the minor have a very different aspect.
On the 28th Eeb., 1872, the tutor buys 327 acres of land for $1000. He stated to the vendor that he bought it for the purpose of mortgaging it to his ward and releasing his other property, so that he could give Newell a mortgage on the latter. On this same day, Eeb. 28, he formally petitions for authority to execute the special mortgage, and proposes to grant it on 125 acres of this thousand-dollar tract. He-convenes a family meeting composed of only two relatives and three- “ friends” of the minor, when there were a number of near kinsmen within thirty miles of Baton Rouge. Two of this family meeting act as-experts and report to themselves and the other members that those 125-acres were worth $2000, although they were bought that day at about three dollars per acre, as shown by the title before the meeting. The •mortgage certificate before them showed judicial mortgages to amount of several hundred dollars bearing on this land. We can not believe that they were sincere in their conclusions that the security was ample, even to secure $1286. But the most extraordinary feature of this proceeding was the account of tutorship rendered on the same day and promptly approved by the under tutor. We do not think that the provisional account rendered in 1868 precluded and estopped the tutor from showing, in subsequent accounts, that he had paid debts of the minor, and claiming credit therefor. But the account rendered on Eeb. 28,1872, was false, fraudulent, and illegal on its face. Thus the largest, item in it reads:
“Paid Dec. 3, 1863, to N. K. Knox, for note to him and claim» transferred by Col. Matta, these debts contracted in 1860 and 1861, $2712 49.”
Here was a debt alleged to have been contracted during the existence of the community, and paid during its existence, (for the wife died' in 1864!) yet charged to the minor as a debt of the community paid after its dissolution.
The next largest item of credit is $2500, the amount of a note of' Elliott’s, dated June 23,1866. There was not a scintilla of proof that-this note given in 1866 was for a debt contracted before the wife’s death in 1864.
This account was homologated and made the judgment of the court. *35 This account therefore constituted the basis of the proceeding to give. the special mortgage, for it was of the essence that there should be an ascertainment of the amount for which this special mortgage was to be given. We think that the fraudulent character of this account and its falsity were patent on the face of it, were exhibited by its own statements and so-called vouchers.
2nd. There can be no dispute at this day as to the entire correctness of the proposition that third persons dealing bona fide are protected by final decrees rendered by courts having jurisdiction of the persons and subject matter before them, and this whether said judgments be right or wrong, honest or fraudulent. But the question here presented is, can a man be bona fide, where the very decree under which he seeks shelter bears upon its very front the brand of falsehood, fraud, and illegality ? Here was a decree which by its own enunciations disclosed that the credits claimed were false and untrue. More than this^ here was a decree which upon its face, under pretext of paying community debts, stripped a minor of his patrimony, inherited from his mother as her paraphernal estate. His mother died having a separate paraphernal estate. Her death devolved this separate estate upon her infant son, and dissolved what is now charged to be an insolvent community. Where is the law which authorized this child’s father and tu„tor to make tiiis separate estate of the minor liable for community debts, and to swallow it up, under pretext of paying them? Where the community is dissolved by the death of the wife, her minor children can not be made liable for the community debts beyond the value of the community property. The minor himself can not accept the community, nor has the tutor the power to do so to the injury of the minor. If such power exists (which we gravely doubt) it would be in the probate court upon the advice of a family meeting.
Newell lived in Baton Rouge, where these things were being done. He had the same attorney as had Elliott, tutor. When Elliott bought the property from Payne, he said it was done in order to clear his other property for Newell’s benefit. All these proceedings for divesting the minor’s mortgages were hurried through in a day or two, and at once followed by the mortgage to Newell. We are impressed with the belief and conviction that Newell was cognizant of every step in the proceeding and interested in the event. The judge a quo so thought, and we think his conclusion fully justified.
We therefore hold that the proceeding whereby the community property was adjudicated to Elliott must be maintained; but that the proceeding to release the minor’s mortgages by substitution of the said special mortgage is without effect and void, both as to the estate of Elliott and his creditors. The account of Eeb. 28,1872, must be set *36 aside as fraudulent and illegal; and the minor’s mortgage, for such isum as may be found due him on a final account of his tutorship, to be rendered by the administratrix of Elliott, must be recognized as being first in rank on all the real estate of the deceased. It is manifest that iieither the account of 1868, nor that of 1872 (being both provisional) can be resorted to as establishing the amount due the minor, for the tutor may after their dates have lawfully expended moneys for which he must have credit.
3d. We see no room to doubt that the Payne judgments are as mortgages prior in rank to the special mortgage of Newell. They were Recorded five years before it, in 1868, in the Book of Judicial Mortgages. 'The legislation of 1869, requiring all mortgages to be recorded in the ■sanie book, did not require mortgages already legally registered to be re-recorded.
That law provided for the future. Nor is there any force whatever in the proposition that Payne as vendor of the 327-acre tract could not without breach of warranty acquire a mortgage thereon by operation of his recorded judgments. What prevented his previously obtained judgments attaching to the property sold by him as soon as that property belonged to his debtor ? Payne’s warranty was that the property was tree of mortgages imposed upon it by himself or previous owners, not that he would not acquire a mortgage on it.
4th. As to the widow’s and minor’s right to the $1000-homestead. The claim is based on Art. 3252, Civil Code:
“ Where the widow, or minor children of a deceased person, shall fee left in necessitous circumstances, and not possess in their own right property to the amount of one thousand dollars, the widow or the legal representatives of the children shall be entitled to demand and receive from the succession of the deceased husband or father a sum which, added to the amount of property owned by them, or either of them, in their own right, will make up the sum of one thousand.”
It is now elementary that laws of this class must be strictly construed and can not be extended by implication or construction. If the Widow, or any one of the minors, or all of them together, possess in their own right flOOO, nothing can be allowed, even if some of them ■have nothing. This is the spirit of the adjudicated cases, and is, we think, correct doctrine. See Stewart vs. Stewart, 13 A. 398. McCall vs. McCall, 15 A. 527, 25 A. 535, 26 A. 615.
As our decree gives the minor William, in his own right, a sum exceeding that amount, and recognizes a first mortgage to secure it, this preeludes the allowance of $1000 to the widow and the other minor.
5üh. The lien and privilege of Newell on the proceeds of the crop of *37 cotton; raised in 1874, to the extent of his recorded supply contract,-$1500, is we think fully established and should have been allowed-.
The objection that the recorder did not register with the contract, the proof of its execution is immaterial. It was a private act. The object of registry is notice, and that was fully effected by the registry in this case. Whatever may be the law as to registry of sales, the Code is explicit as to mortgages and privileges.
Art. 3367 expressly provides that mortgages under private signature may be registered, without previous acknowledgment by party or proof by subscribing witnesses, where the recorder on his own responsibility and knowledge is willing to do so.
It is unnecessary to discuss the question as to the effect of Newell’s sequestration of the cotton prior to Elliott’s death. We may remark, however, that sequestration gives no privilege. It issues on and secures privileges already existing. It is otherwise with attachments and seizures under fi. fa.
6th. The claim of A. Rosenfield should be as a privilege reduced to $21 75.
7th. The physicians’bills — to wit : Dr. Dupree $690, and, Buffington; $250, allowed by administratrix as privileged expenses of last illness, are opposed as excessive, and as having never been registered and therefore not to be allowed as privileges. The accounts though large, are fully proven to be at customary rates. The Civil Code declares that no privilege shall have effect as against third persons unless duly records ed. Art. 3274, C. C.
However unreasonable this provision is when applied to cases like this, still it is the law, and is binding on this court. We know no law excepting or exempting such claims from the necessity of this registry. These claims can not be ranked therefore as privileged. We apprehend that claims which arise after the death of a party, and in the administration of his estate, and which the law classes as privileged, need not be recorded, since registry is without effect, after decease ; and by giving the privilege under these circumstances the law manifestly intends to exempt them from registry. See, also, R. C. C., Art. 3276, so providing,
8th. McCabe’s bill should be allowed as a privilege only for $20, his wages during the time he acted as a domestic servant.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended as follows :
1st. The account of tutorship filed by Elliott, tutor, on Eeb. 28, 1872, and the decree homologating the same are set aside and annulled; the proceeding, orders, and decrees granting permission to Elliott, tutor, to give the special mortgage of March 8,1872, to his ward, and canceling the said ward’s previously acquired mortgages, are also set aside *38 and annulled, and the said previous mortgages of said minor are re-instated in full force, and declared to be first in rank on all the real estate of said Elliott to secure the payment of such amount as may be ascertained, on final account of tutorship to be due him.
2d. The opposition to the widow’s claim for $1000 is sustained, and said claim rejected.
3d. The claim of Newell to be placed- as a privileged creditor on the proceeds of the crop of 1874 is sustained to the amount of fifteen hundred dollars.
4th. The opposition to account of A. Rosenfield is sustained, and his claim as a privilege reduced to $21 75.
5th. The opposition to the claims of Dr. Dupree and Dr. Buffing-ton is sustained in so far as relates to the privilege of said claims, but not otherwise.
6th. The claim of McCabe as a privilege is reduced to $20.
It is further ordered that as thus amended said judgment be affirmed, and this cause is remanded for the sole purpose of having the amount due the minor William, Elliott, ascertained, in accordance with the law and the views herein expressed. The costs of this appeal to be paid by the succession.
Rehearing refused.